(No. 81-CC-053█

ARDEN SHORE ASSOCIATION, Claimant, *v.* THE STATE OF ILLINOIS, Respondent.

*Opinion filed August 22, 1984.*

BOODEL, SEARS, SUGRUE, GIAMBALVO & CROWLEY, for Claimant.

NEIL F. HARTIGAN, Attorney General (MARY MULHERN, Assistant Attorney General, of counsel), for Respondent.

HOLDERMAN, J.

This matter comes before the Court relative to a deduction in the amount of $5,496.50 made by Respondent for services rendered by Claimant from March through July 7, 1977. This matter was tried upon a basic statement of facts between the parties hereto which was 13 pages in length.

Claimant alleges the above set forth amount was for services rendered in 1977 for which the Department of Children and Family Services (hereinafter called DCFS) paid in 1977, and then unilaterally deducted in 1979 from other payments due Claimant.

Claimant is a nonprofit charitable organization that provides residential treatment and special education to socially and emotionally disturbed children between the ages of 11 and 17. It accepts children in two ways, private placement, usually from the family, at which time private funds pay for the child's stay at Arden Shore, and placement from Respondent, DCFS, for which public funds pay for services.

In 1976, pursuant to a contract, Claimant was to provide services to children that DCFS placed with it, and DCFS was to pay $42.50 per day for the child's services.

The present case involves a young man named William Samuel Gerhardt. In the summer of 1976, the patient was confined to a psychiatric hospital. He was 13 years old. This patient had numerous behavioral problems, had run away from the house, was a truant, and had done some auto theft, drug abuse, and was very resistant to authority.

On July 1, 1976, the patient's parents had placed him with Arden Shore. Although they were supposed to pay $12 per day, by September of 1976 they were in substantial arrearages and the patient was not making very much progress.

In September of 1976, DCFS agreed to pay Arden Shore for its treatment of the patient.

The sole question before the Court is whether the Claimant should be paid this $5,496.50 by DCFS for services they rendered, or should the DCFS be allowed to unilaterally deduct that amount for other services that were rendered in May of 1979.

We have to look at the facts to understand how this situation developed when the patient's parents and DCFS agreed to have DCFS fund the patient's stay at Arden Shore. They agreed, DCFS and the parents, that this would last until January 31, 1977, approximately four months.

Claimant was not informed of this agreement, as neither DCFS nor the parents told them. The first information they had relative to the agreement was in May of 1982 when it was included in the statement of facts upon which this claim is predicated.

As far as Claimant was concerned, this was a typical placement by DCFS, pursuant to its contract with DCFS, which contract provides that when DCFS places a child with Claimant, it is to submit a Form 903 within 10 working days of placement and to complete a service plan agreement which includes an individualized goal sort of plan for the child and also to identify the child's caseworker at DCFS.

In October of 1976, DCFS sent this Form 903 to Claimant but it did not complete the service plan

agreement nor did it give any goals for the child or identify the child's caseworker.

Howard Harris, a group leader at Arden Shore, is an employee of Claimant. Claimant made a series of telephone calls to DCFS and wrote a letter in December of 1976 requesting the name of the caseworker who was to be assigned to the patient. There was never any response to the letter or telephone call and they were never informed what the goals were supposed to be.

According to the contract, Claimant was to send DCFS progress reports on the patient. Progress reports were not sent to DCFS because Claimant did not know what goals they were supposed to be dealing with nor did they know who to send them to because they were never informed by DCFS.

In March of 1977, Howard Harris, at the request of the patient's parents, wrote a letter to DCFS, advising them of the patient's projected release date which at that time had been moved to June of 1977. During the same month, the DCFS processed a Form 903 to stop payment, which meant they were going to cut off funding. It was never received by Claimant and the first they saw the Form 903 was in May of 1979, 26 months after it had been prepared.

On April 28, 1977, DCFS held a formal service appeal hearing on the patient, basically to consider whether they were to continue funding of the patient at Arden Shore. Claimant never received a notice of this meeting even though the rules provided that a notice be sent. This meeting was one of the key points in this case, it being Claimant's contention they were not apprised of the type of meeting that was to be held. Mr. Harris, representing the patient's parents, appeared at the meeting and the only reason he attended was that he had

been informed by the patient's parents that it was going to be an informal meeting to discuss the patient's funding. This was one of the points stipulated to in the statement of facts.

There is some debate as to whether or not Mr. Harris was told it was going to be an informal meeting or if he assumed that, although no formal notice was ever given Claimant. Mr. Harris' position is that he thought he was going to support the parents and their son and that they needed support at that time.

It is Claimant's further contention that they were not apprised as to what this meeting was going to be about and they assumed it was going to be an informal meeting, sitting around and discussing the program, or lack of a program, concerning the patient. Claimant's representative did not have any idea it was going to be a formal service appeal hearing and he didn't know anything about funding since he is a group leader and has no knowledge where funds come from.

Claimant contends that if it had been notified of the hearing, he would have gotten together progress reports regarding the patient's development. It is apparent the patient was having very serious disciplinary problems, such as vomiting on members of the staff on purpose, being disruptive, and threatening other students.

There is some dispute as to whether or not it was indicated at this meeting that Arden Shore was letting the patient's payments "slide" until this hearing. Mr. Harris states that he never indicated that and, furthermore, he didn't have any knowledge or authority over funding for students at Arden Shore.

Claimant emphasizes its position that failure to send

a formal notice was a breach of contract between the parties.

The State continued to pay Claimant during this time and Claimant stated it would not throw the patient out on the street even if DCFS cut off his funding. Claimant states that if it had been advised by Respondent that there would be no further funding, it would have tried to secure the funds from some other source. Claimant emphasizes that in cases of this kind they have to secure the source of the funds in advance of providing services.

This settles down to the question of the amount of money paid from March 1, 1977, to July 8, 1977. At this point, the question arises as to why there was no deduction for the month of February. Oral argument indicated the State had voluntarily agreed with the parents to fund for that extra month so that is why there is no dispute over the same.

Claimant's position is that this is a matter of contractual claim and that the contract was broken when Claimant did not receive any notice of the hearing that resulted in a determination of the claim. It is Claimant's further contention that they performed the services they agreed to perform and, two years after they performed said services, the State with no explanation or warning, deducted the money from other payments due Claimant, and that is why this claim was filed.

It is Respondent's position that approximately two months after the child arrived at Arden Shore, his parents signed an agreement with DCFS turning over custody of their son to DCFS. This is the agreement Claimant says it did not know was in existence until after the suit was filed. Respondent's position is that some

three months after the patient was sent to Arden Shore, Arden Shore was getting paid $42.50 per day by the State. The record discloses that DCFS entered into an agreement in July of 1976 with the parents of the boy and from that time on, DCFS became the financial source of payment to Claimant. Respondent acknowledges it did not send written notice to Arden Shore of the service appeal hearing where they were going to consider whether to continue funding the patient.

The Commissioner, in his report, stated the issues are as follows:

1. Whether the State is liable for the value of services rendered to a child who is not within the legal custody of the State.

2. Whether the State is liable for the value of services rendered to a child when Claimant's contract rights are in direct conflict with a Department regulation promulgated pursuant to statutory authority.

3. Whether the State is estopped from raising a legal defense to the claim or seeking recoupment of funds improperly paid.

The DCFS acquired legal temporary custody and financial responsibility, pursuant to the voluntary agreement entered into with the parents of William Samuel Gerhardt, whereby DCFS assumed custody until January 31, 1977. The agreement stated that custody terminated after six months. After DCFS acquired temporary custody of the child, Respondent agreed to pay Claimant $42.50 per day. Claimant rendered services to the patient from October of 1976 to July 8, 1977, and sent Respondent monthly vouchers for these services, which Respondent paid. In May of 1979, nearly two years after the child was discharged by

Claimant, Respondent deducted $5,490.50 from its payment to Claimant.

It is Respondent's contention that the April 28, 1977, meeting was a formal service appeal hearing, Claimant insists it had no knowledge this meeting was to be a formal service appeal hearing and it received no proper notice from Respondent. It was the result of this meeting that Respondent decided not to continue funding for the child.

There is no question but that Claimant has fulfilled its obligation under the contract or that the services it is seeking to recover were received by the patient. Article 16 of the contract between the parties states that: "The parties agree to abide by the decisions made as a result of a hearing under the Department's (i.e., Respondent) service grievance procedure attached as Exhibit E." However, article 16 also states that: "The Agency (i.e., Claimant) shall have the right to notice, the right to be present, and the right to present evidence at a service grievance hearing." The contract provides that notice is to be sent as follows: Arden Shore Association, Box 278, Lake Bluff, Illinois, 60044. Furthermore, section 6 of the Respondent's service grievance procedure, attached as exhibit E to the contract, provides that Respondent's director shall notify the applicant or recipient of the final decision by certified mail.

In this case, there is no dispute that Respondent not only failed to notify Claimant that a service appeal hearing was going to be held on April 28, 1977, it also failed to notify Claimant of the final decision until November of 1979—two years after the hearing and two years after Claimant continued to render services to the child.

When Respondent opted to take advantage of the

service appeal system to not continue funding the child, it became obligated to give Claimant notice of the final decision. Respondent's failure to observe any of these obligations now prevents it from binding Claimant to the decision made as a result of the hearing.

The commissioner's report also sets forth the question of estoppel. It is the Court's opinion that the breach of contract, by failure to give proper notice to Claimant, was such a sufficient breach that no other basis for an award for Claimant is necessary.

It is the Court's opinion that Claimant be awarded the sum of $5,199.00, which is the amount claimed less $297.50, or $42.50 per day for the seven days in July not covered by the contract.

An award is hereby entered in favor of Claimant in the amount of $5,199.00.